NOTICE
This Order was filed under
Supreme Court Rule 23 and
is not precedent except in the
limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 210055-U

NOS. 4-21-0055, 4-21-0056 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 17, 2021
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| *In re* D.R., a Minor <br><br> (The People of the State of Illinois, <br>          Petitioner-Appellee, <br>          v.   (No. 4-21-0055) <br> Dominic R., <br>          Respondent-Appellant). <br><br> *In re* D.R., a Minor <br><br> (The People of the State of Illinois, <br>          Petitioner-Appellee, <br>          v.   (No. 4-21-0056) <br> Ashley B., <br>          Respondent-Appellant). | Appeal from the <br> Circuit Court of <br> Champaign County <br> No. 17JA41 <br><br><br><br><br><br><br><br><br> Honorable <br> Adam M. Dill, <br> Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Holder White and Steigmann concurred in the judgment.

**ORDER**

¶ 1  *Held*: The appellate court affirmed, concluding the trial court's finding of unfitness and termination of respondent's parental rights were not against the manifest weight of the evidence.

¶ 2    In July 2017, the State filed a petition for adjudication of neglect with respect to D.R., the minor child of respondents, Dominic R. and Ashley B. In January 2018, the trial court adjudicated the minor neglected, made him a ward of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondents' parental rights in July 2020. Following a hearing on the State's

motion in October and December 2020, the court found respondents "unfit persons" within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The court then held a best-interests hearing in January 2021, where the court found it was in the minor's best interests to terminate respondents' parental rights.

¶ 3        In February 2021, respondents moved to consolidate the two cases into this one appeal, and we granted the motion. On appeal, respondents argue the trial court erred in terminating their parental rights; specifically, they allege the trial court's unfitness findings and best-interests determination are against the manifest weight of the evidence. We affirm.

¶ 4                                I. BACKGROUND

¶ 5        On July 28, 2017, the State filed a petition for adjudication of neglect, alleging D.R. (born August 8, 2015), the minor child of respondents, was neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2018)) because neither respondent provided proper medical care for him. After a shelter-care hearing, the trial court issued an order finding probable cause for neglect based on the minor's lack of proper medical care. The court placed temporary custody and guardianship of D.R. with DCFS but awarded respondents supervised visitation.

¶ 6                        A. Adjudicatory Proceedings

¶ 7        On December 1, 2017, the trial court entered an adjudicatory order finding the minor neglected under section 2-3 of the Juvenile Court Act (705 ILCS 405/2-3 (West 2018)) in that he suffered from a lack of support, education, or remedial care as defined by section 2-3(1)(a) (705 ILCS 405/2-3(1)(a) (West 2018)).

¶ 8        The trial court also issued a dispositional order on January 4, 2018, finding (1) respondents unfit and unable for reasons other than financial circumstances alone, to care for,

protect, train, educate, supervise, or discipline the minor and (2) it was in the best interests of the minor that he be made a ward of the court and adjudged neglected. The court ordered DCFS to maintain custody and guardianship over the child. DCFS contracted with Lutheran Social Services of Illinois (LSSI) to serve as its agent in monitoring the case.

¶ 9                    B. Termination of Respondent's Parental Rights

¶ 10        On July 2, 2020, the State filed a motion seeking a finding of unfitness and termination of the parental rights of respondents to D.R. The State alleged respondents were unfit pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). The State's petition identified the following two counts as to both respondents: (1) they failed to make reasonable progress toward the return of the minor during any nine-month period following adjudication of neglect, specifically the nine-month period between June 1, 2019, and March 1, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)) (count I) and (2) they were unable to discharge their parental responsibilities, as supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness, or an intellectual disability or developmental disability, and there was sufficient justification to believe that this inability would extend beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2018)) (count II).

¶ 11        The State further contended termination of respondents' parental rights was in the child's best interests and asked for custody and guardianship to remain with DCFS, giving it the authority to consent to the child's adoption.

¶ 12        In October 2020, the trial court held a fitness hearing. Respondents attended the hearing, each represented by different counsel. The State called two witnesses. First was an expert in the field of psychology, Dr. Judy Osgood, a licensed clinical psychologist, who specializes in children's issues. Dr. Osgood testified she conducted a psychological evaluation of respondent

mother in January 2018, where she spent approximately two and a half hours in person with her. As part of her evaluation, Dr. Osgood reviewed information supplied by DCFS, including the integrated assessment, the service plan, a summary of the case, the reasons for the evaluation, and specific referral questions. Respondent mother appeared as "a low-functioning adult" in terms of her cognitive functioning and her mental acuity. In Dr. Osgood's opinion, respondent mother was truthful, cooperative, and participated to the best of her ability. Based on the Wechsler Adult Intelligence Scale, respondent mother's full-scale intelligence quotient showed "significant deficits in cognitive functioning," qualifying as an intellectual disability.

¶ 13        Dr. Osgood testified respondent mother seemed to understand DCFS's concerns about her ability to care for D.R.'s "global developmental delays," but she denied she was unable to care for him. She stated she did not give the doctors consent to have D.R. hospitalized for a week in an attempt to stabilize his seizures, which was "very concerning" to Dr. Osgood and indicative that respondent mother did not understand the extent of D.R.'s medical emergency. According to Dr. Osgood, D.R. had twice been diagnosed with failure to thrive.

¶ 14        Dr. Osgood diagnosed respondent mother with "intellectual disability, mild; adjustment disorder, unspecified; and parent/child relational problem." She recommended her visitation with D.R. continue under supervision. She also recommended respondent mother participate in community services for adults with intellectual developmental delays and supportive counseling to address self-care and hygiene. The State admitted, without objection, the psychological evaluation as an exhibit.

¶ 15        Turning to her evaluation of respondent father, Dr. Osgood reported she conducted additional psychological tests for him because he "was capable of completing them, understanding them, and providing valid results." Respondent father acknowledged D.R. had medical issues and

- 4 -

described incidents when D.R. would " 'space out' " and then fall down. According to Dr. Osgood, respondent father did not seem to understand that D.R. was having seizures. He denied D.R. was medically neglected or that treatment of the seizures was critical. Respondent father reported some depression due to DCFS's involvement with D.R.

¶ 16 Along with the Wechsler Adult Intelligence Scale, Dr. Osgood also performed the Beck Anxiety Inventory and the Beck Depression Inventory. The anxiety test revealed "really mild symptoms" of anxiety, which Dr. Osgood said was consistent with an adjustment disorder. The depression test provided similar results: depression only related to the current circumstances. She diagnosed respondent father with parent/child relational problem, adjustment disorder with mixed anxiety, and depressed mood. She recommended visits with D.R. continue as supervised based upon her perception that respondent father did not understand the severity of D.R.'s medical condition, the importance of administering appropriate medication, respondent mother's limitations in her ability to care for D.R.'s needs, or respondent father's own limitations. As she recommended for respondent mother, Dr. Osgood recommended respondent father participate in supportive counseling to learn the importance of daily self-care and hygiene, develop coping skills, and improve cleanliness of the home. The State admitted, without objection, the psychological evaluation as an exhibit.

¶ 17 Dr. Osgood testified she also conducted a parenting capacity assessment on each respondent, both completed in March 2020. Dr. Osgood said she first met with respondent mother individually to see if anything had changed in the two years since their last meeting. Dr. Osgood said respondent mother was still "pretty angry" and "pretty defensive" about DCFS's involvement. Dr. Osgood saw "[n]o substantial changes [and] [d]efinitely no progress." However, Dr. Osgood did note a "substantial change" in terms of the "increased aggression, and anger, and hostility"

reported to her by several people in several reports. According to Dr. Osgood, respondent mother still did not seem to "really understand the severity of [D.R.]'s seizure disorder and how critical the medication was consistently." Respondent mother did tell Dr. Osgood that she had been meeting counselor Stephanie Beard weekly for individual counseling and parenting education. According to Dr. Osgood, respondent mother had a "consistent attitude" toward those sessions—an attitude of resentment.

¶ 18        When performing the parenting capacity assessment, Dr. Osgood had (1) the February 21, 2020, permanency hearing report, (2) a January 13, 2020, counseling report from Beard, (3) visitation notes from respondent father's father, Terry, who supervised visits, and (4) a report from Community Choices (an agency who had also worked with the family). Dr. Osgood also had collateral interviews with the March 2020 caseworker and the foster parent.

¶ 19        Dr. Osgood testified she then observed D.R. with respondent mother. She first noted D.R. was then four years old, functioning at the level of a two-year old. She described D.R. as a sweet and smiling child. He appeared healthy. She said it "was really clear that he's well taken care of" but he has very limited verbal skills and vocabulary. Dr. Osgood had the caseworker present since the visits were supervised. Dr. Osgood observed that respondent mother "just didn't understand that [D.R.] wasn't comprehending what she was saying" when she would tell him to stop chewing on his fingers, rather than taking them out of his mouth, or asked him what he wanted to do. In Dr. Osgood's opinion, respondent mother genuinely cares about D.R. and he seemed comfortable with her. However, in her opinion, respondent mother should not have unsupervised contact with D.R.

¶ 20        Dr. Osgood noted that, after the parenting capacity assessment, she recommended visits be conducted at the agency and supervised by agency personnel, rather than respondent

father's father, as there were reports that he and respondent father "were verbally harassing everyone involved." She said Community Choices declined further treatment for respondent father due to "his anger and aggression." The State admitted into evidence respondent mother's parenting capacity assessment.

¶ 21 Dr. Osgood testified she also completed a parenting assessment of respondent father, who she described as cooperative, and noted his interaction with D.R. was positive. D.R. seemed comfortable with his father, and they played together appropriately. However, it was apparent to Dr. Osgood that respondent father did not recognize D.R.'s limited ability to understand what respondent father was trying to communicate to him in terms of questions about playtime.

¶ 22 Dr. Osgood testified she had not seen any difference between this meeting and the one two years earlier. Although, she had been made aware of reports from case staff, the foster parent, and service providers that respondent father's problems with anger and aggression had increased significantly. This reported behavior was "very significant" to Dr. Osgood and caused her great concern for respondent father's mental health, thinking he may have bipolar disorder or intermittent explosive disorder. Based upon her observations and concerns, Dr. Osgood recommended respondent father's visitation remain supervised but in the presence of agency personnel, rather than his father. The State admitted into evidence respondent father's parenting capacity assessment.

¶ 23 The State next called as a witness Stephanie Beard, a licensed clinical professional counselor with The Wellness Workshop. Beard said both respondents were referred to her from LSSI for individual counseling, couples counseling, and parenting beginning in December 2017. Their attendance was fairly consistent.

¶ 24 Beard said she diagnosed respondent mother with adjustment disorder with mixed depression and anxiety with some characteristics of post-traumatic stress disorder. When asked to describe respondent mother's progress during counseling, Beard testified: "I would characterize it as while willing to participate and be engaged, not a lot of progress. I would classify it as minimal progress has been made."

¶ 25 Beard conducted the parenting sessions with respondents together. The 12 sessions began in December 2017. She said both respondents were willing to engage. Respondent father "didn't gain any ground, necessarily, but he was in an appropriate level for understanding the components," while respondent mother had "limited insight."

¶ 26 Beard described respondent father's participation in individual counseling as cooperative but, as the case drew on, in December 2019, he began suffering from "case fatigue" or "stagnation." She said they worked on similar issues to those of respondent mother—trying to understand why D.R. came into care.

¶ 27 Neither parent achieved the goals Beard had set out for counseling. She said neither respondent reached the point of accountability, acceptance, or responsibility for the situation. Beard thought both respondents would benefit greatly from a life-skills case management. After Beard reviewed Dr. Osgood's psychological reports, she modified her counseling sessions with respondent mother to keep things simple and short. She also made modifications to respondent father's sessions but "not to the same level." However, she did try "paring everything down into very kind of simple verbiage."

¶ 28 On cross-examination by counsel for the guardian *ad litem*, Beard explained she did not believe respondent mother would ever intentionally put D.R. in harm's way but there were "cognitive deficits that may interfere with the safety of the child in terms of the medical issues and

the ongoing needs of the child." Beard did not see how those deficits could be overcome in order for her to parent safely regardless of the time spent addressing them.

¶ 29　　Beard testified respondent father's parenting exam yielded results demonstrating no progress had been made over the course of the parenting class. He began the sessions at an appropriate level but, according to Beard, his "level did not increase over the course of the 12 sessions." In Beard's opinion, based on his psychological evaluation and his parenting capacity assessment, respondent father would not be capable of parenting D.R. safely due to his "limited capacity for understanding, comprehension, [and] cognitive deficits."

¶ 30　　Bobbi Kennedy, the LSSI caseworker between July 2019 and August 2020, testified respondent mother "wasn't really engaging" in services with Community Choices to help her obtain employment. In September 2019, respondent mother worked very briefly for McDonalds in Champaign. Kennedy said both respondents were inconsistent with individual counseling between August 2019 and March 2020. Kennedy testified she spoke with Beard, who relayed to Kennedy that neither respondent was "grasping parenting techniques appropriately." Beard also relayed to Kennedy that she considered discharging respondent father due to his aggression. Kennedy recalled that in January 2020, respondent mother requested she and respondent father quit individual therapy because neither felt "they were getting anything out of it."

¶ 31　　Kennedy testified she reached out to Community Choices in January 2020 to check on respondents' progress. She was told respondent mother "didn't feel that she wanted to work" and that they would not be sending anyone "out to deal with [respondent father] because of his aggressive behavior and aggressive language. They didn't feel safe."

¶ 32　　Kennedy said she referred both respondents to the PACE, Inc., Center for

Independent Living. However, respondents were still inconsistent in their participation. According to Kennedy, respondents were "very confused" about why D.R. was not in their care. She said they would try to explain it at the child and family team meetings, but "[t]hey don't seem to grasp it."

¶ 33 The State asked the trial court to take judicial notice of this case, specifically the minor's medical records, which were previously admitted at the adjudicatory hearing in December 2017. No party objected. The State rested.

¶ 34 Respondent mother testified she did not gain anything from parenting or individual counseling because Beard "kept repeating everything." She said she understood the importance of D.R.'s medication and could successfully administer it. The following exchange occurred:

"Q. Okay. Do you believe that you could successfully continue to give him his medication as long as his doctor made the dosage clear to you?

A. Yes. And his medication's been helping him.

Q. Okay. He does have a seizure disorder; correct?

A. I did not know that.

Q. Okay. Well, in that case how is his medication helping him?

A. I noticed he's been seizure-free. Matter of fact, he is supposed to have an EEG coming up."

¶ 35 Respondent mother said she only missed one session with Beard due to illness. She confirmed Kennedy's testimony she had attended every visit with D.R. When asked how the visits went, respondent mother said: "They went pretty good. He was happy, lovable kid. He would hug me, kiss me. He—he was much like a smiley kid." Respondent mother rested.

¶ 36 Respondent father presented the testimony of his brother, Terence R., who acted as a third-party supervisor throughout the case. He said respondent father would play, watch

television, feed D.R., and other "routine stuff" during visits. Terence also saw respondent father administer D.R.'s medication to him, stating, "[H]e actually did a really good job in several situations—or, several occurrences." Terence said he had no concerns during the visits. On cross-examination, he said both parents seemed to learn how to successfully give D.R. his medication but respondent father "caught on a little bit quicker" than respondent mother.

¶ 37    Respondent father also called his father Terry R. as a witness. Terry testified he also acted as a third-party supervisor for visits. He said respondent father would play with D.R. and buy him gifts. He would read to him and watch cartoons with him. He said he would feed D.R. snacks, make him dinner, and give him his medication. He said: "Mainly they tried to spend as much time with him they could." Terry said both respondents "did fine" administering D.R.'s medication. Terry testified he had driven respondents to various appointments and if D.R. was returned to respondents, he would continue to drive all three of them to their destinations.

¶ 38    Respondent father testified he participated in the required services and, to his knowledge, he successfully completed the parenting course and individual counseling. He said he did not really learn anything as they "just kept really pointing out [his] anxiety and [his] depressions which just felt like [they] just kept running around in circles basically, but *** it helped in a sense of talking it out."

¶ 39    When asked to describe D.R.'s medical condition, respondent father said:

"From what we have come to know and now is he is epileptic with what they had called absence seizures which just means he would space out, so we tried to learn as much as we can about that and figure out, like, how we can help him through it."

¶ 40    Respondent father said he had attended D.R.'s doctor visits and learned more about

D.R.'s condition. He believed he could give D.R. his medication on his own. He said he would write on a calendar the times and days the medication was to be administered. He would make sure D.R. got the medication on those dates and times and then mark it off each time. He said he had the means and transportation to get D.R. to all of his appointments.

¶ 41 Respondent father testified he had cooperated "to the best of [his] abilities" with services. He admitted he became upset at one of his own appointments, but he believed Beard "overexaggerated it a little bit." He said he and respondent mother had "a minor disagreement."

¶ 42 Respondent father said he never missed a visit. He said he and D.R. would listen to music, watch cartoons, read books, and play. He said he was "trying to help build up his skills and help him learn something and spend time with him." He said he has a lot of family support with his cousins, brothers, dad, and aunt nearby. Respondent father rested.

¶ 43 After considering the evidence, exhibits, medical records, and arguments of counsel, the trial court rendered its decision. Before doing so, the court noted the emotional difficulty in this case because both respondents had "absolutely put forth the best efforts to their abilities to move forward." However, the court found the State had proven by clear and convincing evidence counts I and II. As to count I, related to the grounds of unfitness based upon respondents' failure to make reasonable progress toward the return of the minor during any nine-month period following the adjudication of neglect, namely June 1, 2019, through March 1, 2020 (see 750 ILCS 50/1(D)(m)(ii) (West 2018)), the court stated:

> "And I don't believe based on what I have heard since then any reasonable and substantial progress has been made by either parents, and every—all the evidence I have heard today is consistent with those findings in those permanency hearings, certainly the evidence presented by Ms. Lollar [Kennedy's predecessor at LSSI] as

to her attempts to facilitate reasonable and substantial progress towards the goal of returning home in this case and then Ms. Kennedy with the lengthier period of time that she was the caseworker on this case during the relevant period trying to get these folks making progress towards the goal of return home.

We haven't gotten there and that's really the only issue of whether that's been proven or not during the relevant time period, and as much [as] the parents have tried and as much as they love their son which they clearly do, they have not made reasonable and substantial progress or even reasonable progress in my opinion towards return of the minor home during the period in question. They became frustrated with this process. I am not taking issue with their frustrations. I am taking issue with some of the ways [respondent father] has reacted to that frustration but I think that's all part of his own cognitive issues that he has dealt with his entire life, but he became frustrated and that set us back even more with the way he reacted to that and some of the aggression and verbal—verbal aggression that we have heard about with Ms. Beard in other—in other aspects of this case.

The counseling for each of them has been sporadic, but, more importantly than that, even when counseling has been completed neither one of the Respondent Parents have really learned much, if anything, from that counseling. The Respondent Mother said that [']I didn't get much out of the various counseling['] when she testified and the Respondent Father did say he did learn some things, but as far as the amount of serious issues we're dealing with with [D.R.] that he has now and will have for the rest of his life it again expresses that little to no

understanding of what we need them to understand to move forward and make progress in this case. All of the evidence presented has supported that no matter how hard the parents have tried and no matter how much support [respondent father] has from his family which it appears that he has."

¶ 44    The trial court also found the State met its burden in count II of proving respondents unfit on the grounds of their inability to discharge parental responsibilities due to their mental impairment, mental illness, or intellectual disability as defined by statute and confirmed by a licensed professional. See 750 ILCS 50/1(D)(p) (West 2018). The court relied on Beard's and Osgood's testimony, finding them "extremely credible."

¶ 45                          C. Best-Interests Hearing

¶ 46    The trial court held the best-interests hearing in January 2021. The State presented the best-interests reports from LSSI and the court-appointed special advocate (CASA). All parties stipulated the author of each report would testify consistently with the contents of the report if called as witnesses. The State presented no further evidence.

¶ 47    The only other evidence presented was respondent father's testimony. He described his visits with D.R. as "normally good." He testified in his parenting course with Beard he learned patience, how to improve D.R.'s motor skills, how to help D.R. learn, and how to "not, like, be[ ] mad." He said he would be able to give D.R. his medication and get him to his doctors' appointments. He said he would "really love the opportunity to get to raise [his] son," which he feels he has been "stripped of." He said: "People make mistakes. I think we've learned from our damn mistake to be honest. *** You know, I just feel like we should have a second chance to do right by our kid mainly above everybody else."

¶ 48    The CASA best-interests report explained D.R. has been seizure-free since October

2017 and has been in the same foster home since July 28, 2017. D.R. has a close relationship with his foster family, who are dedicated to ensuring his needs are met. D.R. participates in occupational and speech therapies. He has made progress, but he still has various difficulties that are being addressed. CASA questioned respondents' ability to monitor and provide the appropriate levels of specialized care required and described the care he receives in the foster home as "excellent." D.R. "is in a stable, loving foster family environment that includes other children, all of whom show affection toward him." He is attached to his foster parents and family, who treat him with "kindness and with acute sensitivity to his needs." CASA reported the foster home is meeting D.R.'s physical and emotional needs and he is receiving the supportive service and guidance he requires. In CASA's opinion, D.R.'s "health could suffer and even be put in jeopardy if he were to be removed from this home and be returned to his biological parents." CASA recommended the termination of respondents' parental rights.

¶ 49　　　　LSSI's best-interest report indicated D.R. was "bonded to his caregivers" and was otherwise consistent with CASA's report. LSSI acknowledged respondents' love for D.R. but noted the specialized care he needs and that "neither parent is able to provide [such care] at this time." According to LSSI, respondents had demonstrated, due to their own limits, that they cannot safely and adequately care for D.R. and, as a result, LSSI recommended respondents' parental rights be terminated to allow the foster parents to provide D.R. with permanency through adoption.

¶ 50　　　　After the arguments of counsel, the trial court indicated it had considered the statutory best-interests factors, the evidence, and the best-interest reports to determine D.R.'s special needs are "best served where he's at." His foster family "meets his needs to the full[est] and he can thrive." The court acknowledged the efforts respondents had put forth but noted it had to "do what's right and [it had] to do what's best for [D.R.]" The court found it to be in D.R.'s best

interests to terminate respondents' parental rights.

¶ 51    The trial court's written judgment outlined its findings from the fitness and best-interests hearings. Specifically, the court's order found: (1) respondents were "unfit persons and parents" and (2) it was in the best interests of the minor D.R. and the public that respondents have their residual parental rights and responsibilities terminated, and the minor relieved of all obligations of obedience and maintenance with respect to respondents.

¶ 52    This appeal followed.

¶ 53                                    II. ANALYSIS

¶ 54    Respondents argue the trial court erroneously terminated their parental rights because the court's unfitness and best-interests determinations go against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 55    The Juvenile Court Act (705 ILCS 405/1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person" and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D) (West 1998) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998)). Here, respondents challenge the trial court's determinations at each of these steps. We address their challenges in turn.

¶ 56                            A. Unfitness Finding

¶ 57                                    1. *The Law*

¶ 58    " 'The State must prove parental unfitness by clear and convincing evidence ***.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067

- 16 -

(2004)). The Adoption Act provides several grounds on which a trial court may find a parent "unfit." Here the State alleged, and the trial court found, respondents were unfit on the following grounds: (1) their failure to make reasonable progress toward the return of D.R. during the nine-month period between June 1, 2019, and March 1, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)) and (2) they were unable to discharge their parental responsibilities due to mental impairment, mental illness, or an intellectual or developmental disability beyond a reasonable time period (750 ILCS 50/1(D)(p) (West 2018)). Despite multiple potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83; see also *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.") (citing *In re D.D.*, 196 Ill. 2d 405, 422 (2001)).

¶ 59        As the reviewing court, we pay " 'great deference' " to a trial court's fitness finding " 'because of its superior opportunity to observe the witnesses and evaluate their credibility.' " *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011) (quoting *In re Jordan V.*, 347 Ill. App. 3d 1057, 1067 (2004)). We "will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *A.L.*, 409 Ill. App. 3d at 500. "Each case concerning parental unfitness is *sui generis*, requiring a close analysis of its individual facts ***." (Internal quotation marks omitted.) *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 19. Thus, we now turn our attention to the facts of this case.

¶ 60        Addressing the first ground, respondents claim neither Osgood's testimony nor Beard's testimony specifically addressed the relevant time period or their respective lack of

progress and thus, they argue, the State failed to prove a "failure of progress during the time alleged, and the court's finding that it did was against the manifest weight of the evidence."

¶ 61    Section 1(D)(m) of the Adoption Act provides, in pertinent part, as follows:

"The grounds of unfitness are any *** of the following ***:

* * *

(m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected or abused minor[.]" 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 62    In *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001), the supreme court discussed the following benchmark for measuring "reasonable progress" under section 1(D)(m) of the Adoption Act:

"[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent."

¶ 63    In *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991), this court discussed reasonable progress under section 1(D)(m) of the Adoption Act and held as follows:

" 'Reasonable progress' is an objective standard which exists when the [trial] court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently

- 18 -

demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.)

¶ 64　　　　　　　　　　　　　　　2. *This Case*

¶ 65　　　　　In evaluating the trial court's unfitness finding based upon respondents' failure to make reasonable progress, we look primarily to Osgood's, Beard's, and Kennedy's testimony. After her psychological evaluations of both respondents, Osgood determined that neither parent understood the severity, importance, or depth of D.R.'s special needs, both medically and developmentally. Despite D.R.'s diagnosis of failure to thrive on two separate occasions, both respondents insisted they were capable of caring for D.R. To address this misconception, Osgood recommended individual counseling for each, which would address coping skills, parenting skills, and self-help. Both respondents participated in such counseling with Beard.

¶ 66　　　　　Beard testified that during respondents' counseling sessions, which began in December 2017 and continued through March 2020, neither made substantial progress. Beard testified respondent mother willingly participated but "not a lot of progress" was made. She classified it as "minimal progress." According to Beard, respondent father suffered from "case fatigue" or "stagnation" which hindered any progress for him. His parenting exam showed no progress over the 12 sessions. Neither respondent progressed toward the goals of accountability, acceptance, or responsibility for the circumstances.

¶ 67　　　　　Kennedy testified respondents complained to her that they were not "getting anything out of" counseling. Respondent mother "didn't feel she wanted to work," and neither

respondent participated in the PACE program as requested.

¶ 68       Just after the relevant nine-month period ended on March 1, 2020, Osgood completed a parenting capacity assessment on each respondent to evaluate their progress since their psychological evaluations. Osgood saw "[n]o substantial changes [and] [d]efinitely no progress" for respondent mother and "not really any difference" for respondent father.

¶ 69       Based on this evidence and reviewing it pursuant to the applicable standard of review, as we are required to do, we conclude the trial court's unfitness finding based on respondents' failure to make reasonable progress toward the return of the minor between June 1, 2019, and March 1, 2020, was not against the manifest weight of the evidence. As reiterated above, the evidence demonstrated the court would not be able to order D.R. returned to respondents' custody in the near future. See *L.L.S.*, 218 Ill. App. 3d at 461.

¶ 70       Because we affirm the trial court's finding of unfitness on this ground, we need not address respondents' contentions regarding the other basis of unfitness. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 2 (stating a single ground of unfitness under section 1(D) is sufficient to support a finding of unfitness).

¶ 71                        B. Best-Interests Determination

¶ 72       Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the minor's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004); see also *Julian K.*, 2012 IL App (1st) 112841, ¶ 80 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights serves a child's best interests, the trial court

- 20 -

must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2018). These factors include:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *Daphnie E.*, 368 Ill. App. 3d at 1072; see also 705 ILCS 405/1-3(4.05)(a) to (j) (West 2018).

¶ 73 A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 74 Respondents contend the trial court's determination that it was in the minor's best interest to terminate their parental rights goes against the manifest weight of the evidence because of the loving relationship between both parents and D.R., respondents' desire to have him back in

their custody, and the support they have from extended family.

¶ 75        However, the evidence before the trial court suggested D.R. was thriving in his foster placement, unlike his situation while in respondents' home. His specialized and extensive medical and developmental needs require an attentive, capable, and compassionate caregiver. There is no doubt, based on witness testimony and the trial court's comments, that respondents and D.R. love each other. Unfortunately, D.R. requires much more—more than respondents are capable of providing.

¶ 76        The best-interest reports indicated the following: (1) D.R. was receiving excellent care from his foster parents; (2) all of D.R.'s developmental, medical, and social needs were being met; (3)  he was bonded to his foster family; (4) D.R. seemed comfortable and secure in his placement; (5) he attended all of his numerous medical and therapy appointments; and (6) the foster home could provide permanence through adoption. The trial court took great care and consideration of all of the circumstances involved before determining that termination of respondents' parental rights was in D.R.'s best interests. Given our review of the evidence and its application to the statutory best-interest factors, we cannot say the opposite conclusion is clearly apparent.

¶ 77                                    III. CONCLUSION

¶ 78        For the reasons stated, we affirm the trial court's judgment.

¶ 79        Affirmed.